**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

MAY 0 9 2017

LAWRENCE K. BAERMAN, CLERK
ALBANY

A.S. a child with Autism Spectrum Disorder [ASD] entitled
to Special Education and Related services per IDEA
represented by his parents R.S. *Pro Se* and E.S. *Pro Se*

                    *Plaintiffs*                        COMPLAINT

                    -against-                           Case No. 1:17-cv-501

                                                        (LEK/CFH)

Board of Education Shenendehowa Central School District,
Justyne Bates, Chief State Review Officer Office of State Review
New York State Education Department
Commissioner MaryEllen Elia, of The University of the State of New York

                    *Defendants*

---

Plantiffs, R.S. and E.S., individually, and on behalf of their son A.S.

represented By R.S. *Pro se* and E.S. *Pro se, allege the following:*

### The Parties

1. Plantiff A.S. is a 6 year old boy with an Individualized Education Plan [IEP] that is entitled to all rights, entitlements and procedural safeguards mandated by applicable laws and statutes, including but not limited to IDEA [20 U.S.C. § § 1400 – 1482], Article 89 of the New York Education Law, 34 CFR §300, 8 NYCRR 200, and Section 504 of The Rehabilitation Act of 1973.

2. Plantiffs R.S. and E.S. are A.S. parents

3. Plantiff A.S., E.S. and R.S. are a residents of the State of New York, residing at all relevant times within the Shenendehowa Central School District, within the Northern District of New York.

4. Plantiffs are not expressly named herein by their given names because of the privacy guarantees provided in the IDEA statute.

5. Defendant, The Shenendehowa Central School District ["Shen"] is a "local educational agency" and school district organized under the laws of the State of New York. Both procedurally and substantively, defendant Shen is statutorily obligated under the IDEA, Article 89 of the New York Education Law, 34 CFR §300, 8 NYCRR 200, and Section 504 of The Rehabilitation Act of 1973 to provide A.S. with a Free Appropriate Public Education [FAPE] in A.S.'s Least Restrictive Environment [LEA] to the maximum extent appropriate. Shen is located within the Northern District of New York at 5 Chelsea Place Clifton Park, NY 12065 Phone: [518] 881-0600; Fax: [518] 371-9393.

6. Defendant Justyne P. Bates, Esq., Chief State Review Officer; Office of State Review New York State Education Department is located within the Northern District of New York at 80 Wolf Road, Suite 203 Albany, NY 12205-2643 P: [518] 485-9373 F: [518] 485-9377

7. Defendant, Commissioner MaryEllen Elia of the New York State Education Department her office is located at the New York State Education Department within the Northern District of New York at 89 Washington Avenue Albany, New York 12234 P: [518] 474-3852.

**Jurisdiction and Venue**

8. Pursuant to 20 U.S.C. § 1415[i][2][A], 28 U.S.C. §1331, §1367 and §1391[b][2] this Court has jurisdiction of this action without regard to amount in controversy 20 U.S.C. § 1415[i][3] over all civil actions arising under the laws of the United State, and upon the fee-shifting provision of IDEA, 20 U.S.C. § 1415[i][2][A].

9. Venue is proper in that all Plantiffs and defendants all reside or are situated within this judicial district

**Exhaustion of Administrative Remedies and Prior History**

10. R.S. called the Shenendehowa District Office on 10/8/2015 to again express concerns of substantial regressession observed in A.S. since the first day of school at Tesago Elementary School on 9/7/2015 where phone call was returned later that day and R.S. expressed concerns and scheduled a meeting with the CSE regarding the observed regression of A.S.[1]

11. On 10/22/2015 the CSE meeting did not appear to accomplish anything as educators assured R.S. and E.S. that everything was fine.  Further, the notes for the meeting prepared by Fall 2015 Kindergarten Connections Program Special Education Teacher from Tesago demonstrated that the skill level A.S. exhibited in the classroom [District Ex. 30] was below the skill level he had exhibited at home and also that he had regressed to exhibit echolalia, a behavior that A.S. had previously extinguished at Newmeadow by extinction procedures [Tr. pp. 1126].  This concerned the parents further: that participants at the CSE meeting claimed A.S. was perfectly fine and that they did not notice signs of regression and that they could not get him to demonstrate skills he had already achieved months earlier and continued to R.S. claimed that goals on the IEP had already been achieved at home and that A.S. did not demonstrate in the class based on teacher observations.

12. Some days following that 10/22/2015 meeting R.S. demonstrated to Fall 2015 Special

---

[1] A meeting notice dated 10/13/2015 was placed in the mail during the month of October for a CSE meeting to occur on 10/22/2015 [District Ex. 34]
[2] It that contained a greater amount of detail regarding A.S. regression and proposed solutions and it was accepted in as part of the original complaint by Director of Special Education.

Education Teacher from Tesago that A.S.'s skill level was beyond what his educational update demonstrated with use of ABA and Discrete Trial Training. Fall 2015 Special Education Teacher from Tesago later applied the DTT technique to get results that showed that A.S. [Tr. pp. 212 – 213; 476] skill level was beyond what was recorded by Fall 2016 Connections Teacher albeit still not consistent with level A.S. demonstrated with parents delivered ABA intervention.

13. By 11/2/2015 the due process complaint IHO case# 93791 was hand delivered to the Shenendehowa District Office [that was not District Ex. 31]. R.S. met with the Director of Special Education and Elementary CSE chairperson regarding the due process complaint minutes after dropping off the due process complaint to the District Office.

14. However, A.S. had undergone further regression during the time between when the complaint was written 10/20/2015 and 11/5/2015. Because A.S. regression had substantially worsened on 11/10/2015 R.S. sent a follow up due process complaint [Joint Ex. 37][2] that Shen agreed to absorb into the original complaint.

15. Around that time S.T.J. Esq. of Ferrara Fiorenza Shenendehowa's attorney for that matter sent a correspondence that A.S. teachers indicated that Tesago teacher's reported that he was progressing quite well.

16. On 11/4/2015 A.S. completes and alumni visit to Newmeadow School where Executive Director noted an inability to make eye contact and a return to stereotypical behavior for A.S. [Tr. pp. 730 – 735, 753 – 756, 759 – 761] in comparison to where he was on 8/2015 during the ESY at Newmeadow.

17. On 11/30/2015 as a result of the resolution agreement for the due process complaint A.S.

---

[2] It that contained a greater amount of detail regarding A.S. regression and proposed solutions and it was accepted in as part of the original complaint by Director of Special Education.

returned to Newmeadow as a general education student [counted as a nondisabled peer because it was the only way the state education laws would allow A.S. to return to Newmeadow] in the integrated intensive ABA setting.[3]

18. By 12/31/2015 no Procedural Safeguards notice was provided by the Shenendehowa School District for the year of 2015.

19. Upon A.S. return to Newmeadow, on 11/30/2015 Director of ABA Program, noted A.S.'s data demonstrated he had significantly regressed compared to the period of April 2015 – August 2015 that includes the prior 2015 summer session and 2015 regular school year at Newmeadow [Tr. pp. 730 – 735, 753 – 756, 759 – 761, 1025 – 1026, 1127 – 1129; 1286 – 1295] and also noted by Executive Director.  A.S. data [District Ex.  40] indicated that A.S. began to recover from the regression at Tesago by late January 2016.

20. R.S. had emailed Director of Special Education  on 3/23/2016, more than one month prior to the IEP meeting to have a premeeting discussion. Consequently, R.S. had a phone conference with CSE chairperson on 4/4/2016.  During the 4/4/2016 phone conference CSE chairperson, R.S. express how well A.S. was doing at Newmeadow and how all the regression that was noted at Tesago had extinguished for some time.  R.S. expressed that he wanted to ensure that modifications were made to A.S. IEP for the 2016 – 2017 school year and to the program being offered so that it was more consistent with the classroom make up and ABA methodology offered at Newmeadow since it was the only educational

---

[3] At 5 hours per day [25 hours/week] receiving 5 hours of special education services each week and 25 hours of intensive ABA intervention at Newmeadow each week.  Special arrangements had to be made because A.S. was school age and Newmeadow was not approved to deliver a Kindergarten curriculum.

environment that A.S. had ever responded well to.[4]

21. On 4/19/2016 A.S. Fall 2015 Special Education Teacher from Tesago visits Newmeadow for observations [District Ex. 44] of A.S. for 30 minutes [Tr. pp. 242 – 244; 304 – 309].[5]

22. During May 2016 an IEP meeting was held for A.S. that with Executive Director of Newmeadow, Program Director of ABA program and A.S.'s Newmeadow Speech Pathologist in attendance [Tr. pp. 774 – 778]. During the spring 2016 CSE meeting the SRO quotes it as "very contentious," and a "great deal of disagreement" existed about the "direction of the IEP" between the parents and a district representative at the meeting (Tr. pp. 776-79). This initial CSE meeting ended with a "disagreement" with the management needs section of the IEP, which had been "discussed at length" (Tr. pp. 780-82)." [SRO Decision 17-008 pp. 29].

23. On 5/21/2016 Parents meet with Dr. Malone of Developmental Pediatrics to discuss risks for A.S. if he does not receive ABA and recommendations moving forward [Parent Ex. JJ].

24. R.S. followed up with Director of Special Education and a follow up IEP meeting was scheduled with CSE Chairperson and Director of Special Educaiton in early June 2016 a few weeks following the prior IEP meeting. From this meeting no agreement could be

---

[4] Elementary CSE Chairperson expressed that A.S.'s report showed he made very good progress at Tesago. R.S. reiterated that A.S. had a significant regression at Tesago. Consequently, Elementary CSE Chairperson replied that they would have to observe A.S. at Newmeadow and determine what the appropriate placement. Elementary CSE Chairperson expressed that from that report it could be determined that an all day self-contained environment could be the right placement for A.S. and left things at that. It is worth mentioning that R.S. interpretation of the statement by Elementary CSE Chairperson along with taking her tone of voice indicated that she was warning R.S. not to interfere with A.S. IEP or a negative evaluation at Newmeadow by Shen would follow.

[5] Notes were significantly biased pertaining to negative observations of A.S rather than providing a thorough account, the document later found its way into the Defenses Exhibits equating to another procedural error

made on any section of the IEP. Further, from this meeting parents could not get agreement from the CSE to place specific goals similar to the Kindergarten Curriculum into the IEP. The rational for the goals was that A.S. was making a lot of academic progress in the ABA intervention he was receiving from parents and at Newmeadow. The CSE rational for not allowing the goals proposed by parents was the IEP had to be substandard from the standard Kindergarten Curriculum. Parents disagreed with this rational and later learned that such rational is by law a denial of A.S. rights pursuant to Section 504 of the Rehabilitation Act of 1973.

25. Also, what came out of the CSE meeting was a statement from the Director that NYSED did not permit schools to put methodology in the IEP. She requested that parents try to provide descriptions of ABA because her hands were more or less tied down with regard to this ambiguous rule.

26. During June and July weeks several emails were also exchanged with Director of Special Education with regard to the Management Needs section of the IEP and also goals for A.S.

27. A follow up CSE meeting that occurred at Tesago Elementary School in June was not fruitful in resolving any of these matters.[6] In general CSE meetings were never fruitful in making any progress in A.S. IEP as the CSE insisted on using the same failed program for A.S. where goals and present levels were below A.S. abilities.

28. On 7/7/2016 the school district informed R.S. and E.S. that the CSE made

---

[6] No agreement on the Management Needs regarding ABA, no agreement to provide an all day integrated program [now A.S. required a general education setting as an integrated setting is too restrictive], no agreement could be made on IEP goals, no agreement on present levels. However, Special Education Director incorporated some of the more trivial elements of the requested changes of the management needs section while avoiding the most important changes that was not a suitable solution nor compromise for the parents.

recommendations that were against parents request or that failed to acknowledge other disagreements.[7] Testimony by ABA Program Director indicates that Newmeadow was not authorized by New York State Education Law to provide a more challenging curriculum beyond the preschool level and that other skills in excess of the preschool curriculum could only be observed during generalization [Tr. pp. 1136 – 1137]. Newmeadow made available to Shen a general education progress report on A.S. [Tr. pp. 1135]. On early August 2016 R.S. calls Director of Special Education to express concerns about the IEP process and what has been accomplished. On 8/4/2016 E.S. and R.S. email Shen Superintendent for Curriculum regarding the need for a comprehensive ABA classroom for A.S. On 8/5/2016 Shen Superintendent for Curriculum replies to E.S.'s email explaining that "parents do not influence methodology in the IEP." On 8/5/2016 R.S. hand delivers Due Process Complaint obo A.S. [along with a DVD containing PDFs of all the reference publications in the due process complaint] to Shenendehowa District office prior to 4:00pm and Superintendent for Curriculum signs for the due process complaint dating the signature 8/5/2016 as received with no other modification.[8]

29. On 8/5/2016 R.S. hand delivers Due Process Complaint obo A.S. [along with a DVD containing PDFs of all the reference publications in the due process complaint] to Shenendehowa District where Superintendent for Curriculum signs for and dates the complaint as received on 8/5/2016.

30. On 8/19/2016 R.S. contacts IHO by phone that Shenendehowa School District Failed to hold a Resolution Meeting by 15 calendar days following the receipt of the complaint

---

[7] For example, the letter indicated that Goals were reviewed rather than indicating that there was a disagreement on goals. Further, present levels were reviewed and parents insisted that A.S. abilities displayed at home influence the present levels and the goals.

[8] Several emails were exchanged in disagreement on the filing date of the due process complaint [Parent Ex. M].

because no meeting was scheduled on 8/19/2016 and none had been scheduled for 8/20/2016. Pursuant to [CR Part 200.5[J][2][vi][b]] R.S. requested the IHO order that the 45-calendar-day due process hearing timeline for school-age students commence on 8/21/2016. However, the IHO still required the resolution session to occur citing it was a Federal Law despite Shen fail to hold the meeting on time.

31. On 8/23/2016 the conference between parents and School District regarding the due process complaint occurred via phone. Special Education Director claiming that A.S. responded well to the Connection Program previously and introduced Ms. Connections Program Fall 2016 Special Education Teacher at Tesago as a teacher heavily experience in model ABA classrooms.

32. A letter was received in the mail from Shen attorney, Susan Johns, stating in writing that new special education teacher was part of a model ABA program at prior school district.

33. Later Testimony by Fall 2016 Special Education Teacher at Tesago [Tr. pp. 157 - 159] on 10/5/2016 demonstrated that she had lied to parents regarding her experience with ABA.

34. On 8/29/2016 A.S. begins full time home based ABA therapy and intervention program during most of his waking hours 6 days a week, with 5 hours of academic [math, phonics, writing] and social skills [Expressive language, social skills and communication skills] discrete trials per day.[9] This was a transition from the program previously provided by parents that occurred for a portion of the day after A.S. complete his day at Newmeadow.

35. During early September 2016 R.S. requests Pendency placement for A.S. and Hearing Officer declines to make any pendency decision even following numerous requests from

---

[9] The remaining time focused on self-help skills, Lego building, a puzzle component, logical reasoning, physical education that included soccer discrete trials, a dexterity component to strengthen hand grip and fine motor control of fingers, an art component for drawing images such as cars, people, animals and objects in a stepwise manner

R.S.

36. On 9/14/2016 the Principle of Tesago Elementary notified Child Protective services that A.S. did not attend Tesago Elementary School for 6 consecutive days and that it was considered educational neglect.

37. R.S. calls Tesago Principle that Day 9/14/2016 or following day to explain that A.S. would not attend Tesago because of the risk that it could cause irreparable harm to A.S., this was said in so many words.

38. Parents declined to send A.S. to Tesago Elementary School and choose to educate A.S. at home during nearly all his waking hours because of severe regression from the fall of 2015 and that the program offered to A.S. did not materially change in the way parents requested.

39. On 10/5/2016 Educational Hearing Commences, 46 Calendar days following the initiation of the due process hearing timeline, from 10/5/2016 - 10/7/2016 at which point hearing has a 3 week recess and continues on 10/26/2016 – 10/27/2016. R.S. felt that he had insufficient time at the hearing to give testimony at hearing and was also cut short time wise.

40. On 12/30/2016 Decision is issued by Hearing Officer George Kandilakis and sent via mail that was received on or about 1/2/2017. Hearing Officer dismissed the case entirely.[10]

41. On 1/12/2017 Parents file an intention to homeshool with tuition reimbursement and Shen replied sending a standard homeschooling packet not acknowledging the request for tuition reimbursement

---

[10] An educational update on A.S. filled out in a similar matter to an educational update that a home schooling provides a school district was sent to the Hearing Officer and the School District on 12/25/2016 as part of parents reply to the defenses post hearing brief

42. On 1/13/2017 Family Court Judge orders parents to get their homeschooling plan approved by Shen.

43. On 2/7/2017 R.S. and E.S. submit appeal of Hearing Officer decision to State Review Officer of the New York State Education Department.[11]

44. On 2/8/2017 Family court Judge Pelagalli orders parents to initiate process to enroll A.S. in School

45. On Friday 2/17/2017 A.S. attends first day at Tesago Elementary School. Upon coming home from the morning kindergarten setting that was an integrated classroom parents observe A.S. had a slurr in his language and loss in motivation. Shen was on spring break for from Monday 2/20/2017 to Friday 2/24/2017.

46. On 2/27/2017 A.S. is enrolled in a Saratoga Academy for the Arts and sciences and attends his first day of school. A.S. was very talkative and motivated after his first day of school.

47. Parents send notice of Unilateral Placement at Saratoga Academy to Shen on 2/28/2017 explaining that the program would result in serious emotional harm to A.S.

48. The due date of the SRO decision was delayed because of requests for time extensions.

49. On 4/6/2017 SRO decision is received in the mail where the appeal was sustained in part to the extent that the SRO found that Shen failed to offer A.S. a FAPE in the LRE for the 2016 – 2017 school year. Also, SRO ordered that the CSE reconvene within 30 days of the decision to do a Newington two-pronged analysis for A.S. after the SRO had already completed one supporting the parents contention.

---

[11] An educational update on A.S. filled out in a similar matter to an educational update that a home schooling provides a school district was sent to the SRO and the School District on 2/7/2017 as part of parents appeal

50. New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

51. A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1];

8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4[a]). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

52. 4. A party aggrieved by the decision of an SRO may subsequently begin a Federal Action in the appropriate United States District Court.   Clifton Park New York is part of The Shenendehowa School District and A.S. along with his parents are located in Clifton Park, New York.  Because Clifton Park, NY is located within Saratoga County and Saratoga County is within the boundary of the Northern District of New York, the appropriate venue for this appeal is the United States District Court for the Northern District of New York.

**FIRST CAUSE OF ACTION: THE ORDERS THAT FOLLOW THE SRO'S SUSTAINMENT OF THE PARENTS REQUEST FOR REVIEW EFFECTIVELY RENDERED THE SUSTAINMENT MOOT AND**

**COMPROMISES THE WELL BEING OF A.S. BY DELAYING THIS MATTER**

53. The Chief SRO sustains the parents' appeal in part finding that "the evidence in the hearing record establishes that, contrary to the IHO's determination, the district failed to offer the student a FAPE in the LRE for the 2016-17 school year." [See NYSED SRO Decision 17-008 pp. 43] but does almost nothing about it. While the SRO sustains the appeal in part the SRO reduces this sustainment with no orders for action beyond ordering the CSE to reconvene by May 5th, which is more or less to render the sustainment of the appeal completely moot and is to the compromise of the well being of A.S. by delaying this proceeding, by not issuing orders consistent with IDEA and the Second Federal Circuit Legal Precedent.

54. The effect of ordering the CSE to reconvene is to send the case back down to a lower judicial body so that if disagreement again arises the parents would have to again file a due process complaint and then again appeal to the SRO and get a decision to be back at square one. This process could easily take until 2018 to reach the SRO once again to address the same issue.

**SECOND CAUSE OF ACTION: THE SRO ERRONOUSLY SIDED WITH SHEN ON THE PENDENCY DETERMINAITON**

55. The SRO did not issue parents reimbursement for pendency placement [if their actions is so defined as pendency] of A.S. as part of the ABA intervention parents provided to A.S.

from 8/29/2016 – 2/7/2016.  The SRO's rational was that A.S. [SRO Decision pp. 41] "however, the parents now argue that the student's home-based ABA services, which began on August 29, 2016, constitute the student's pendency placement. In this case, focusing the inquiry on the last agreed upon placement at the moment when the due process proceeding was commenced—here, August 5, 2016—leads to the conclusion that the student's home-based ABA services, which began on August 29, 2016, cannot be the student's pendency placement (see Murphy, 86 F. Supp. 2d at 359), and therefore, the parents are not entitled to reimbursement for the ABA services they provided to the student on this basis. Instead, it appears that the special education services set forth in the resolution agreement—and thereafter, reduced to the IEP entered into the hearing record as District Exhibit 33—represents the student's last agreed upon placement at the time the parents commenced the due process proceeding. Consequently, the parents' request to be reimbursed for providing the student's home-based ABA services must be dismissed." This is seriously erroneous rational forwarded by the SRO.  First, the SRO assumes that the home-based ABA services began on 8/29/2016.  This contention is not accurate A.S. was receiving home based ABA services from the parents since late spring of 2015 [that evolved to be more complex and strategic in nature over time as a consequence of practice combined with study of the theory and methods used in ABA] after the parents received training from the Preschool's BCBAs.   Rather it is argued that on 8/29/2016 A.S. began exclusively receiving intervention from parents.

56. The SRO further erred in determining that the last agreed upon IEP was District Exhibit 33 since that IEP was dated 10/22/2015 and two due process complaints were filed during November 2015 an IEP.  This was a seriously erroneous assumption that the SRO applied

because District Exhibit 33 preceded the due process complaints. A further, erronous assumption by the SRO was that Exhibit 33 could be extrapolated to be the last agreed upon IEP from district Exhibit 39, the resolution agreement.

57. A review of the resolution agreement [District Ex. 39] reveals that part of the resolution agreement states that the services would be provided at Newmeadow. And that the District would transport the student to Newmeadow in the morning and then pick him up in the afternoon. The transportation dropped of the student each day at the ABA Preschool at approximately 9:00am and then picked him up each day at approximately 2:00pm. Thus, the district transported the student to be at Newmeadow for 5 hours each day at 5 days per week or 25 hours each week. Further the Director of Special Education contacted the Preschool to make arrangements for them to take A.S. as a general education student while agreeing to pay the Preschool for 5 hours of direct services. Taking these two facts: 1] that the Director made arrangement for A.S. to return to Newmeadow 2] that the Director made arrangements for A.S. to be transported to and from Newmeadow to be there for a 5 hour day strongly supports that the last agreed upon IEP was one that included 25 hours of the ABA program offered at the Preschool per week. In addition to the 25 hours of ABA programming at the preschool each week the parents provided ABA intervention to A.S. at about 20 hours per week, and also during nearly all of A.S. waking hours.

## THIRD CAUSE OF ACTION: THE SRO DID NOT REIMBURSE THE PARENTS FOR UNILATERAL PLACEMENT ERRONOUSLY APPLYING PROCEDURAL SAFEGUARDS

58. The SRO did not issue parents reimbursement for unilateral placement [if their actions are so defined as unilateral placement] of A.S. as part of the ABA intervention parents provided to A.S. from 8/29/2016 – 2/7/2016.

59. [IHO Decision pp. 1 - 17] The IHO did not acknowledge request for retroactive tuition reimbursement [regardless of whether the placement was Pendency or Unilateral placement] for parents delivering an ABA behavioral therapy and instruction program. Similiarly, the SRO failed to side with the parents despite finding that [NYSED SRO Decision 17-008] "the evidence in the hearing record establishes that, contrary to the IHO's determination, the district failed to offer the student a FAPE in the LRE for the 2016-17 school year." If district fails to offer a student a FAPE in the LRE then the child is entitled to have reasonable costs associated with receiving an education reimbursed if the parents can demonstrate that their private placement was appropriate. The SRO states "the evidence in the hearing record does not include any notification by the parents that they intended to withdraw the student from the district and seek reimbursement for services, such as the 10-day notice of unilateral placement called for by the IDEA (20 U.S.C. § 1412[a][10][C][iii][I]; see 34 CFR 300.148[d][1]). Thus, other than the parents now requesting reimbursement for delivering the home-based ABA therapy and educational program as a unilateral placement, the hearing record contains no evidence that I find is an appropriate basis upon which to predicate an award of tuition reimbursement as envisioned under Burlington/Carter."

60. The SRO in this case makes her decision on the basis that there may be a limitation on reimbursement. However, careful inspection of the reference Procedural Safeguards Document reveals the following guidelines for recompense [pg. 40 – 41 of the June 2016 version of the Procedural Safeguards Notice]:

61. "However, the cost of reimbursement:"1. must not be reduced or denied for failure to provide the notice if: (a) the school prevented you from providing the notice; (b) you had not received notice of your responsibility to provide the notice described above; or (c) compliance with the requirements above would likely result in physical harm to your child; "

62. That A.S. threw himself to the floor on numerous occasions at Tesago Elementary School in response to his distaste for the Connections Program and bullying the Tesago students engaged in with A.S. [see Joint Exhibit 1 [the Due Process Complaint filed in August of 2016 [tab 12] and Parents Exhibit S [Equivalent to Joint Exhibit 37] the due process complaint filed in November of 2015; and Tr. pp. 214, 237, 284, 315, 316, 1401]. Thankfully, with numerous such occasions of A.S. throwing himself to the floor at Tesago Elementary School during the fall of 2015 there were no cases where A.S. sustained any injury.

63. There was also numerous other occasions where A.S. could have sustained injury from the program at Shenendehowa [see Tr. pp. 1426 - 27] and in general A.S. was much more difficult to manage by the parents while at Tesago and this difficulty in managing A.S. increased the risk that he could have accidentally injured himself as a result [See. Joint Exhibit 1 [tab 12] pp. 2 – 5 and Joint Exhibit 37 [tab 19]]. For these reasons alone the SRO's statement on 10 days notice does not apply and the parents are entitled to

reimbursement. Thankfully avoidance of the Connections Program has enabled A.S. to consistently behave, be happy and be a well behaved child of good character.

64. However, there is further support for the parent's argument: Reading further into the Procedural Safeguards the cost of reimbursement "2. may, in the discretion of the court or an IHO, not be reduced or denied for the parents' failure to provide the required notice if: (a) the parent is not literate or cannot write in English; or (b) compliance with the above requirement would likely result in serious emotional harm to the child."   Again referencing the same exhibits and testimony in the transcript the parents also argue that even 10 days in the connections program would have likely resulted in serious emotional harm to A.S.  The parents further state that on or about 9/14/2016 R.S. had a conversation with Principle Pace of the Tesago Elementary School Stating that A.S. would not attend the Connections Program because it would endanger A.S. well being.

65. In prior cases such as [Application of the…, Appeal NYSED SRO Decision No. 15-025] SRO cites that  "A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim [Florence, 510 U.S. 7 [1993]; Sch. Comm. Of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]].]. In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA [471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192]. "Reimbursement merely requires [a district] to belatedly pay expenses that it should have

paid all along and would have borne in the first instance" had it offered the student a FAPE [Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]"

66. Further in [Application of a STUDENT WITH A DISABILITY, NYSED SRO Decision No. 15-001] If a district fails to offer a student FAPE, it is next necessary to consider whether the unilateral placement selected by the parent was appropriate. A.S. is provided educational instruction specially designed to meet his unique needs at the correct intensity of 50 hours per week targeted intervention in addition to nearly all his waking hours in a active but untargeted sense. A private school placement" [in A.S.'s case a program delivered by R.S. and E.S. designed to meet his unique needs] "must be "proper under the Act" [Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370], i.e., the private school must provide an educational program which meets the student's special education needs [see Hardison v. Bd. of Educ., 773 F.3d 372, 386 [2d Cir. 2014]"... " A parent's failure to select a program approved by the State in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14). The private school need not employ certified special education teachers or have its own IEP for the student (id. at 14). Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate" (Gagliardo, 489 F.3d at 112; see M.S. v. Bd. Of Educ., 231 F.3d 96, 104 [2d Cir. 2000]"

67. In bearing the burden that the home based ABA intervention program was appropriate for A.S. the parents first cite the SRO decision pertaining to the appropriateness of A.S. goals. While the parents dispute the appropriateness of the goals laid out in the disputed IEP [[tab 128] District Exhibit 45 pp.]. Astonishingly, the SRO ruled that the goals set fourth in the disputed IEP were appropriate [See SRO Decision pp. 25]"As the discussion above

demonstrates, the evidence in the hearing record leads me to the overall conclusion that the annual goals in the June 2016 aligned with and targeted the student's needs identified in the present levels of performance, appropriately addressed the student's needs, and were sufficiently specific and measurable to guide instruction and to evaluate the student's progress over the course of the school year" In comparing A.S. progress in the January 27th, 2017 update provided on A.S.

68. These exhibits are educational updates that were provided to the Shenendehowa School District despite no IHIP being filed.  A.S. made quite substantial gains from the ABA intervention that we the parents provided.  For example, compare A.S.'s educational updated dated 1/27/2017 [Parents New Exhibit SSS] to the IEP goals [[tab 128] District Exhibit 45 pp. 5] that CSE proposed for A.S. to achieve by 6/15/2017 and you will notice that these achievements are far beyond the goals that CSE set in the last IEP that the CSE generated [this was the IEP that was contested per the Due Process Complaint] in every category.  As another point to support the parents provided an appropriate program and a program more appropriate than that of the Connections Program the parents cite the testimony by the Fall 2015 Kindergarten Connections Program Teacher for A.S. during the fall of 2015.  She later applied an educational technique demonstrated by R.S. to get results that showed that A.S. [Tr. pp. 212 – 213; 476] skill level was beyond what was recorded in the Connections Classroom albeit still not consistent with level observed at home.  To this extent, the Parents had to provide ABA training to the Tesago Elementary school-teacher to help demonstrate that A.S. level was beyond what she was able to get him to demonstrate in the class.  Again supporting the appropriateness of the home based program provided to A.S.  Another element of the home based program was exposure to

typically developing peers. To this extent R.S. had A.S. attend Pals after school care 2 – 3 days a week and soccer two times each week totaling 5 opportunities per week for social engagement in both conversational situations and competitive sport situations. At Pals afterschool care R.S. worked with the staff to create social opportunities that increased A.S. social participation within the classroom using a book Making a Difference by Catherine Maurice proving exercises for increasing peer interaction in the classroom. R.S. ensured that A.S. participated in an educational and social experience that was consistent with kindergarten general education and his progress reflected that such a program was appropriate and well thought out by R.S. and E.S.

**FOURTH CAUSE OF ACTION: THE SRO FINDS THAT DEFENDENTS FAILED TO OFFER A.S. A FAPE IN THE LRE FOR THE 2015 – 2016 SCHOOL YEAR BUT DOES NOT AWARD LEGAL FEES TO PARENTS**

69. While the SRO states that "the evidence in the hearing record establishes that, contrary to the IHO's determination, the district failed to offer the student a FAPE in the LRE for the 2016-17 school year." No Pro se legal fees were reimbursed to parents as part of the fee-shifting provision of IDEA, 20 U.S.C. § 1415[i][2][A] even though the fees were reasonable and amounted to $50 per hour for 500 hours of effort and $1,500 in expenses.

**FIFTH CAUSE OF ACTION: THE SRO ERRED IN THAT THE SRO DID NOT FIND FOR THE PARENTS THAT THE IHO WAS BIASED**

70. The SRO dismisses the parents complaint that the IHO was biased by stating "Here, the parents—as the party bearing the burden to provide evidence with respect to the IHO's

alleged bias—level nothing more than bald, conclusory assertions without any explanation to support those assertions. The parents do not cite to or point to any specific instances in the hearing record as evidence of how the IHO's discretion to preclude evidence constituted bias or how the IHO's actions interfered with their ability to present their case. Instead, the parents cite generally to the transcript corresponding to their proffer of exhibits at the impartial hearing (see Req. for Rev. ¶ 1)." [see NYSED SRO decision 17-008 pp. 15].

71. In footnote 21 of the SRO decision the SRO makes an erroneous statement designed to make the parents appeal appear as if there is no disagreement with the IHO decision by characterization a point of accuracy in the parents appeal aimed to get a statement related to interpreting facts whose establishment can lead to legal orders from the SRO on the precision of the IHO statements. The SRO chooses a point by the parents that has real meaning when taken in context and reduces it to an insignificant moot statement. For example the notion that ABA intervention had a dramatic impact on A.S. life was reduced by the IHO to state that the parents believe A.S. to benefit from ABA. The SRO disparagingly treats this request for an adjustment of the IHO statement to an unimportant nuance and then later states that in the decision that for methodology to be warranted that the parents must establish that the methodology itself is a necessity, but chooses to ignore pertinent information.

72. The parents were limited to 10 pages in a request for review that prevented them from going into any detail into the issues and IHO rulings that they disagreed with. Rather the parents had to maximize those elements of their request for review that could be

communicated within few words so as not to limit the number of issues/IHO rulings they wanted to address.

## SIXTH CAUSE OF ACTION: THE SRO CONTORTS MUCH OF THE FACTS TWEAKING THEM IN A MANNER FAVORABLE FOR THE DEFENDANTS.

73. The SRO has written much of the decision with interpretation of information to erroneously draw conclusions to "contort" information in a convenient manner to reach an erroneous conclusion. However, here the number of times that the contortion occurred to disfavor the parents and favor the district strongly suggests they must have been knowingly done by the SRO. In one case the SRO could argue that the information was sufficiently high and difficult to navigate through to warrant the errors. Next, the SRO might argue that the SRO disfavored the parents because the SRO gives the district the benefit of the doubt while denying parents such a privilege, creating a double standard, which led to the numerous errors favoring the district. However, that would be unfair in the face of the law. Finally, both parties were local to the SRO and the SRO could have easily scheduled a conference with both parties to get clarity on the information that she needed aid in the interpretation of facts.

## SEVENTH CAUSE OF ACTION: THE SRO ERRED BY NOT SUPPORING THE PARENTS REQUEST THAT THEIR EXHIBITS SHOULD HAVE BEEN ACCEPTED BY THE IHO AND THAT IS UNFAIRLY DISADVANTAGED A.S. CASE.

74. *"The IHO refused to accept nearly all of our exhibits into evidence [Tr. pp. 56 – 108], preventing the IHO from considering them in his decision and preventing us from using them to question witnesses and use them for our brief.[12] "* The SRO Justyn Bates

---

[12] We could spend many pages justifying the exhibits and were not permitted additional space to do so based on correspondence with the Office of State Review. Correspondence from Nicholas Steinbock-Pratt on 1/20/2016.

wrongfully prevented admitting any of that evidence [that makes up 45 exhibits] in our appeal.

75. The entire process of proffering exhibits was biased in favor of the Shenendehowa School District and further nearly every exhibit that the parents proffered was not admitted into evidence thus the parents cited the entire portion of the transcript as it relates to the proffering of exhibits [Tr. pp. 56 – 108].   The SRO goes on further to say: "Moreover, while impartial hearing rights include the right of both a parent and a district to "present evidence and confront, cross-examine, and compel the attendance of witnesses" (34 CFR 300.512[a][2]; see 8 NYCRR 200.5[j][3][xii]), State regulation requires that an IHO "exclude evidence that he or she determines to be irrelevant, immaterial, unreliable or unduly repetitious" (8 NYCRR 200.5[j][3][xii][c])."

76. The SRO fails to mention that the IHO determined the evidence to be beyond the scope of the hearing [Tr. Pp. 58, 61, 67 - 68] instead citing a generalization from (8 NYCRR 200.5[j][3][xii][c]) rather than the specific course the IHO took to prevent admission of evidence. The nature of the SRO's response is to the extent that the SRO criticizes of the parents appeal only to so conveniently use the very same approach the SRO's own response when the SRO does not have such a page limit.

77. The IHO's determination of the scope of evidence was that any shred of evidence provided by the parents may only be admitted into evidence if it pertained directly to A.S. [Tr. pp. 65 – 67; 69 - 71] More specifically, the document itself must specifically mention A.S.'s name to be admitted [Tr. pp. 65 - 71] or A.S. must be a subject of that specific study referenced in the publication to that extent that he must be a data point or make up the statistic.  For example, the parents proffered publications on interventions [known as

Early Intensive Behavioral Intervention [EIBI] or Intensive Applied Behavior Analysis [ABA]] that A.S. had been subjected to at Newmeadow but the IHO sustained the defenses objection where the IHO cited that A.S. was not a subject in the study. However, the IHO would claim that it was beyond the scope of the hearing. However, the IHO so conveniently took in documentary evidence that did not pertain to A.S. [Tr. pp. 550 - 558] that are referred to as IHO Exhibits 1 - 4. The manner in which it was executed was for the IHO to persuade parents into initially making it a joint exhibit. These 2 documents, related to the Developmental Approach by Barry Prizzant known as IHO exhibit 1 [Tr. pp. 557] are documents on an approach that the fall 2016 Tesago Special Education Connections Kindergarten teacher was familiar with as a result of attending seminars in, but was not credentialed in. However, there were two such witnesses that had credentials in ABA, known as Board Certified Behavior Analysts [BCBA], but the IHO still refused to admit parent's exhibits and publications on ABA and also documents created by the BCBA credentialing board know as the Behavior Analysts Certification Board [BACB].

78. The SRO goes on further to say that "Consistent with State regulation, a review of the transcript cited by the parents reveals that the parents presented each and every exhibit for the IHO's consideration, that in many instances the district's attorney voiced objections to the exhibits, and the IHO explained the rationale underlying his decision to ultimately sustain the district's objections to preclude the parents' evidence (see Tr. pp. 56-108)." However, again the SRO faults the parents for not being specific in how the IHO prevented evidence from being admitted but again cites the same exact section of the transcript [Tr. pp. 56-108] that the parents cited in their appeal to the SRO. Further, there

is no single mention of the IHO's specific rational for not admitting evidence only a reference to [Tr. pp. 56-108].

79. "A review of the same portions of the transcript also reveals that the IHO made considerable efforts to assist the parents throughout their evidentiary submissions by explaining the role of evidence and by indicating that, subject to a proper foundation elicited from a witness, some of the parents' evidence (i.e., articles or publications) might then be entered in the hearing record as evidence (see, e.g., Tr. pp. 56-60, 64-67, 71-72, 92, 97-98)." Here the SRO attempts to not only further justify the IHO's precluding of the parents' evidence but also the SRO attempts to demonstrate that the IHO was assisting the parents in evidentiary submissions.

80. However, careful examination of the record would reveal that the IHO would not allow admission of the articles or publications proferred under no circumstance. Rather, what was allowed was that if a witness was familiar with an article or publication they may look at it and prosecution may ask questions that pertain to the articles. But under no circumstance was the witness or the parents allowed to read out loud for the record any information from the publications, not admitted into the record see Generally [Tr. pp. 58 – 71] also see IHO conduct towards R.S. questioning of witnesses with regard to specific proffered exhibits not received into the record by the IHO.

81. Ultimately the IHO and SRO have unfairly disfavored the parents case with regards to both the management needs section and programming section of A.S. IEP.

82. Specifically, A.S. benefits substantially from an intensive ABA [or EIBI, intensive ABA and EIBI are one in the same] program. This precluding of exhibits on the intervention that A.S. received is no different than excluding exhibits of publications on

pharmaceuticals that a patient took, for the same ailment that was the subject of study in the publication, citing that the patient was not a test subject in the publication. There is no rational for not admitting the exhibits. At the very least ailments are classified so that proper intervention can be provided. To preclude evidence that shows intervention efficacy is to legally preclude the needed intervention all together in the form of a decision by both the IHO and SRO. I would imagine that when people with some ailment that are denied a needed treatment engage in a legal pursuit that it would be necessary to prove that some form of treatment has efficacy to establish that they needed it to begin with and also to establish that the other treatments have not been effective.

**EIGHTH CAUSE OF ACTION: PRECLUDING THE USE OF METHODOLGY IN AN IEP IS TO PRECLUDE A.S. AND OTHER CHILDREN WITH AUTISM THEIR LEGAL RIGHT TO A FAP—THAT IS PROVIDED BY INTENSIVE ABA INTERVENTION—THAT IDEA IS SUPPOSED TO GUARANTEE.**

83. A.S. benefits significantly from an intensive ABA approach when provided with typically developing peers. However, Shen has constantly hidden behind a rule where the CSE, including the director, generally claim that schools are not required to list methodology on an IEP's Management Needs Section. Both the IHO and the SRO supported that methodology was not a component of A FAPE. [See SRO Decision pp. 10] "Finally, the IHO conveyed that while "much of the parents' testimony and argument focused on ABA as being the only method to instruct their son, there [was] strong judicial authority in support of the legal proposition that IDEA d[id] not guarantee a right to a particular methodology or personnel" (IHO Decision at p. 16). As such, these matters were

"appropriately left within the discretion of the local school authorities provided the method selected provide[d] FAPE" (id.)."

84. The SRO upholds the IHO decision that methodology is not required but later on page 13 of her decision states "Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B])" The SRO goes on further to say "A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits" However, there are no programs that are established at any school district, not grounded in ABA, that confer educational benefits to the students with ASD. Consequently, there are sizable portion [more than 70%] of students with ASD that are seriously shortchanged by IDEA where IDEA does not ensure that students with ASD "have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living"

85. Here we argue that this rule that is set by the Commissioner of Education causes undue and irreparable harm on students with ASD that substantially benefit from ABA by not requiring ABA be provided to the if parents so request it. The Commissioner of Education is an appropriate additional party to have suit against for this cause of action [although she is not the only party to be named for this eighth cause of action]. The SRO

states [SRO Decision pp. 33] "State regulation and guidance documents define management needs as the "nature and degree to which environmental modifications and human or material resources are required to enable the student to benefit from instruction" (8 NYCRR 200.1[ww][3][i][d]; see "Guide to Quality Individualized Education Program [IEP] Development and Implementation," at p. 20, Office of Special Educ. [Dec. 2010], available                                                                                at http://www.p12.nysed.gov/specialed/publications/iepguidance/IEPguideDec2010.pdf [providing examples of environmental modifications (i.e., consistency in routine, limited visual or auditory distractions, adaptive furniture), human resources (i.e., assistance in locating classes, following schedules, and note taking), and material resources (i.e., instructional materials in alternative formats)])"... "A student's management needs must be developed in accordance with the factors identified in the areas of academic or educational achievement and learning characteristics, social development, and physical development, and reported in the student's IEP (see 8 NYCRR 200.1[ww][3][i][d], 200.4[d][2][i])." While the SRO cites these specifics the SRO nor the Commissioner of Education do not make any effort to establish how they can be accomplished without the use of proven methodologies. Rather, these appear to be just objectives with no guidelines for how they are accomplished for specific ailments. This ill-informed approach to not require specific proven approaches to treat students whose educational needs can result in serious future consequences if not addressed renders the tenets in IDEA related to IEP management needs to nothingness leaving too great a latitude to the school districts.

86. Further the SRO goes on to say [SRO Decision pp. 35 ] "Turning specifically to the question of methodology, the director initially stated that "[w]e do not include methodology in the IEP" (Tr. p. 508).[13] The director also testified that placing a methodology on an IEP "pigeonhole[d] a staff member into only utilizing one very specific tool that may or may not work for the student" and it provides the teacher with "no flexibility to access their professional knowledge" (Tr. pp. 508-09)." The statement from the director should have received criticism from the SRO rather the SRO condones the decision of the director to not include methodology siding with the district that the teachers have sufficient background to help a student with ASD make progress but offers no such proof that they are qualified to do so. Perhaps part of the issue lies in the fact that a degree in special education is not a proof that the teacher can effective educate a child with ASD despite that the SRO does not question how the special education teachers at Shen will be effective in education children with ASD.

87. The SRO goes on further to say [SRO Decision pp. 36] "Generally, a CSE is not required to specify methodology on an IEP, and the precise teaching methodology to be used by a student's teacher is usually a matter to be left to the teacher's discretion—absent evidence that a specific methodology is necessary (Rowley, 458 U.S. at 204; R.B. v. New York City Dep't of Educ., 589 Fed. App'x 572, 575-76 [2d Cir. Oct. 29, 2014]; A.S. v. New York City Dep't of Educ., 573 Fed. App'x 63, 66 [2d Cir. July 29, 2014], aff'g 2011 WL 12882793, at *16 [E.D.N.Y. May 26, 2011] [noting the "broad methodological latitude" conferred by the IDEA]; K.L. v. New York City Dep't of Educ., 530 Fed. App'x 81, 86 [2d

---

[13] She explained that it was not included for a "number of reasons," most significantly because when hiring "professionals to teach and provide services to students, we rely on their expertise and their ability to carry out an IEP" (id.).

Cir. July 24, 2013]; R.E., 694 F.3d at 192-94; M.H., 685 F.3d at 257 [indicating the district's "broad discretion to adopt programs that, in its educational judgment, are most pedagogically effective"]; see M.L. v. New York City Dep't of Educ., 2014 WL 1301957, at *12 [S.D.N.Y. Mar. 31, 2014] [finding in favor of a district where the hearing record did not "demonstrate[] that [the student] would not be responsive to a different methodology"]; but see A.M. v. New York City Dep't of Educ., 845 F.3d 523, 541-45 [2d Cir. 2017] [holding that "when the reports and evaluative materials present at the CSE meeting yield a clear consensus" regarding methodology, absent evidence to the contrary a program that does not recommend the use of that methodology will not be reasonably calculated to enable the student to receive educational benefits])." This statement by the SRO that hearing record did not demonstrate that the student would not be responsive to a different methodology is a fallacy: How can one prove this where there are an infinite number of possible approaches to intervention by virtue of the exponentially increasing number of combinations one could develop with all the approaches listed. Further, should a district first try every possible approach on a student that the district has qualifications in for several years only to find out that none were effective and so much time has passed that it may not be possible for the child with ASD to catch up. The more appropriate statement should have been to state that it must be proven that students with the condition of said student do respond well to the methodology provided. Here we argue that it was the case that it was established that A.S. only responded well to ABA through his own experiences and regressed substantially from the Connections Program see [Joint Ex. 1 and Joint Ex. 37], that A.S. incidentally underwent an ABAB reversal " See the Wikipedia Article on single Subject Research [https://en.wikipedia.org/wiki/Single-subject_design]:

The reversal design is the most powerful of the single-subject research designs showing a strong reversal from baseline ("A") to treatment ("B") and back again." by virtue of the fact that "**A**" he did not receive integrated ABA [did not make much progress] then "**B**" received integrated ABA [made much progress] then "**A**" was removed from integrated ABA and placed in Tesago Connections Program [substantially regressed] and then "**B**" went back to ABA and again made much progress [See Joint Exhibit 1 and Joint Exhibit 37]. Second we argue that when the director was asked to provide proof that the Connections Program helped students make gains in cognition or adaptive behavior she could not provide a single statistic stating the she neither had the data nor conducted the tests on the students to get the data [Tr. Pp. 530 - 550] We find that amusing given that she has been the director for a number of years. Finally, we argue that we have proferred a number of exhibits containing published data on ABA demonstrating that it is the only methodology proven to be effective for Autism by the American Psychological Association. According to the American Psychological Association [APA] in order to validate a treatment approach to autism it is required to have atleast 9 studies involving atleast 20 persons from six different sites. EIBI also referred to as Intensive ABA has 22 different studies published over the last 20 years.[14]

88. Limiting the use of an effective technique by preventing the use of any term that is defined to be a methodology is like to deny a patient with many difficulties the very treatment that will enable them to flourish and be a productive member of society

89. Why would the Commissioner of Education want to prevent children with ASD access to the intervention that is proven to both increase their IQ and adaptive behavior scale: the

---

[14]EIBI or Intensive ABA is the only validated approach to treating autism that meets the APA's treatment validation definition. See [Parent New Ex. PP time 1:15:00 – 1:16:25].

only two measures that indicate whether one can expect to fully recover from their autism. And why would she want to remove the responsibility of the school districts to be required to provide an intervention that would help the ASD students make real progress

90. In this sense it can be argued [but certainly not required nor a necessary requirement to validate this cause of action] that the United States Government should be a Plantiff in this complaint as well, given that is the U.S. Government that ultimately foots the bill for the people with ASD that never become fully independent. Exhibit 14 [N]: Are Autism Facts and Statistics Taken from the autism society website at http://www.autism-society.org/what-is/facts-and-statistics/ (8/26/2015). Strikingly you will notice that the United States spends $236 – 262 Billion annually on Autism Services where much of that cost $175 - $196 Billion are in adult services. [Compare this number to the national military budget and you will notice it is nearly half of the $610 billion total annual budget for    every    aspect    of    the    military.    [Ref: https://en.wikipedia.org/wiki/Military_budget_of_the_United_States ]. The failure of the public school system to adequately address ASD can have a financially devastating impact of the U.S. Government.

91. It is necessary to turn students with ASD from consumers of government dollars to earners that can pay the U.S. Government back through paying taxes that they otherwise may be unable to pay if they do not get the intervention they need from the public schools.

92. By the NYSED robbing many children with ASD of an appropriate education they are thereby robbing the citizens of this country because providing students with the needed ABA intervention will more likely ensure that they will be independent taxpaying citizens rather than resulting in a serious capital expenditure for the U.S. Government. It is well

established that early intervention is the most effective approach and it can be reasonably be concluded that if all children with ASD are offered the option ABA until they are recovered as a matter of right will save the U.S. government $100 billion annually in the long run despite that more dollars would be invested at the school age level less will have to be funded for their adult lives.

93. In the case A.S. has substantially benefitted from ABA where no other intervention has proven effective for him in learning concepts, acquiring new skills and improving his language and communication skills.

**NINTH CAUSE OF ACTION: THE SRO FAILS TO REALIZE THAT PRESENT LEVELS OF PERFORMANCE WAS AN ISSUE REAISED IN THE IEP BY VIRTUE OF THE APPROPRIATENESS OF GOALS BEING RASIED AS AN ISSUE.**

94. The SRO erroneously finds that the Present Levels of Performance in A.S. IEP for the 2016 – 2017 school year was not an issue raised in the due process complaint. However, the SRO does acknowledge that "With respect to the annual goals, as noted above, I find that the parents did raise this as an issue in the due process complaint notice"

95. Here the parents argue that if issues are reasonably raised with regards to IEP goals that those issues must be dependent on lower level arguments such as Present Levels. One cannot have a valid argument that IEP goals are inaccurate unless present levels are also invalid.

96. The parents argue that the issues raised with regard to present levels are implied in their raising of issues with the appropriateness of goals even though it was not specifically stated. There are too many fine details in the special education laws to file a complaint

against a school on every issue would be to create an excessively long due process complaint or to water down much of the remaining sections of the complaint.

97. For example, in order to access the appropriateness of goals a competent would first look to the present levels to make predictions about what goals are appropriate.

98. Integral to this question of raising issue with the present levels the SRO, like the IHO, erroneously found that the goals set by the district were appropriate. The SRO's initial rational was to simply quote the [IHO Decision pp. 11, 15]. But the SRO recognized that it would require further discussion [SRO Decision pp. 18]. Inspection of the SRO's referenced section of the IHO Decision reveals that there was nothing in the IHO sections related to goals that even referenced present levels. However, the SRO Decision [SRO Decision pp. 21 – 25] has a rather large section on goals with detailed discussion where there was little the SRO was able to conclude because of the districts meddling in the Preschools input into the IEP. Ultimately, in order to determine if the goals were accurate the SRO necessitated the use of the present levels of performance to make a determination on reasonable goals. The SRO decided in favor of the district that the goals were accurate because the SRO erroneously relied on the Present Levels, while being aware that the parents took issue with the present levels in their request for review, but belligerently ignoring that fact when doing an analysis of the present levels to determine if goals were appropriate. It is surely here, at that moment in the analysis, that the SRO should have recognized that the parents issue with present levels, even though not mentioned specifically in the due process complaint, was validated by the SRO's own approach.

99. How can an SRO consider the decision valid and fair when the SRO must use information [present levels] seriously disputed by the parents [by finding a weak legal argument to try

and dismiss the complaint about present levels] to make a determination about goals. The SRO recognized the two [goals and present levels] were interdependent measures and surly should have found that such an argument necessitated a review of the present levels. And even if the SRO neglected to do so it was a seriously unfair approach to use them to reach a decision about the appropriateness of goals. Further, the parents mention in their Memorandum of Law that [See Parents New Exhibit IIII pp. 28] "The Connections Program fails to offer FAPE to A.S: that the goals are not appropriate because the present levels were not appropriate" establishing the link between the goals and the present levels that the SRO should have followed.

100.   It is a simple argument that if one reaches a decision on invalid data then their decision must be called into question. It is worth mentioning that the SRO was provided two educational updates on A.S. dated 12/19/2016 and 1/27/2017 [Parents New Ex. QQQ and SSS] in the Parents Request for Review. And further the SRO states [See SRO Decision pp. 19] "Generally, documentary evidence not presented at an impartial hearing may be considered in an appeal from an IHO's decision only if such additional evidence could not have been offered at the time of the impartial hearing and the evidence is necessary in order to render a decision (see, e.g., Application of a Student with a Disability, Appeal No. 08-030; Application of a Student with a Disability, Appeal No. 08-003; see also 8 NYCRR 279.10[b]; L.K. v. Ne. Sch. Dist., 932 F. Supp. 2d 467, 488-89 [S.D.N.Y. 2013] [holding that additional evidence is necessary only if, without such evidence, the SRO is unable to render a decision])." The SRO goes on further to acknowledge the Parents New Ex. QQQ and SSS [SRO Decision pp. 20] but declines to lead any value to them stating in the footnote 28 "The progress during a period post-dating

both the June 2016 CSE meeting and the filing of the due process complaint notice is irrelevant to a prospective determination of whether the goals were appropriate to meet the student's needs as of the time they were developed." The SRO further states [SRO Decision pp. 20] "(the probative value and context of which is unclear) for consideration on appeal (see Req. for Rev. Exs. JJJ; QQQ; SSS; UUU). Although these proffered documents may not have been available at the time of the impartial hearing, the parents offer no rationale as to why the documents are now necessary to consider to render a decision in this matter" However, the parents would argue that the SRO again forwards an illogical line of reasoning in that the SRO would have been able to ascertain some information about A.S. abilities up to the date of the last disputed IEP because there are limits on the rate of progress that a person can make. For example, research in Autism has shown that the maximum rate of learning that a child with ASD can demonstrate during Early Intensive Behavior Intervention is about 2.2 years [2.2 years is the maximum and 1.7 years is the average for higher functioning children with autism during the first year of 40 hours per week of professional intervention] of progress per year of time when compared to the normal rate of learning for typically developing children over one year [Compare Parents New Ex. F pp. 16 to Parents New Ex. X pp. 6]. Generally, this high learning rate occurs only during the first year of learning when a child with autism is exposed to ABA intervention for the first time at an intensity of 40 hours per week [Compare Parents New Exhibit J pp. 7 with Parents New Ex. R, Parents New Exhibit E pp. 7 - 8] from a professional therapist and then intervention during the remainder of all their waking hours by the parents. Given that A.S. was exposed to ABA for 2 years prior to the parent based intervention the reasonable learning rate to have expected would have

been closer to a maximum of 1.8 years of cognitive progress per year. Retrospectively, we could take A.S. 1/27/2017 educational update and make some predictions on where A.S. present levels were on 6/14/2017 227 days or 0.623 years prior. From this data it would be reasonable to conclude that the maximum gain that A.S. would have made over 0.623 years is about [[1.8 age equivalents of learning / year of learning] X 0.623 years = 1.12 years of progress]. From this we can conclude that the 1/27/2017 educational update would represent an accurate list of goals for A.S. to achieve by the conclusion of the 2017 school year supporting the both the goals set by the district were not accurate. To place into perspective the difference between the goals set by the school district and the 1/27/2017 educational update represent 2 - 3 years of educational progress [Compare District Ex. 45 pp. 5 to Parents New Exhibit SSS]. Despite, the parents allude to this drastic difference in their Request for Review [Parents New Exhibit JJJJ pp. 4] "A.S. has substantially surpassed [Parent New Ex. QQQ; SSS] all the annual goals in his IEP [District Ex. 47] and listed in the decision [IHO Decision pp. 11] and had surpassed them before [Joint Ex.1, Tr. pp. 212 – 213] they were written; they are inappropriate.

**TENTH CAUSE OF ACTION: THE SRO ERRONOUSLY DOES NOT ACKNOWLEDGE THAT THE DISTRICT COMMITTED A NUMBER OF PROCEDURAL VIOLATIONS.**

101.    The SRO erroneously dismissed the parents' complaint that the district committed an excessive number of procedural violations that impeded A.S. access to a FAPE in the LRE because the SRO claims that the issue of procedural violations was not raised by the parents in the due process complaint and thus cannot now raise this as an issue [See SRO Decision pp. 17].

102. Here the parents argue first that it is not necessary to use the term procedural violation if the elements of complaint itself are predicated on procedural violations. And Second that some of the procedural violations rasied in the Request for Review they were not made aware of until after carefully reviewing the material in the hearing. Further, in general it can be argued that no due process complaint can even pass the test of validity if there are no procedural violations that take place during the development of the IEP. How can a parent of any valid due process complaint validly file one that does not depend on procedural violations also occurring.

103. The obvious first argument in any due process complaint is that a parent files one if they truly feel they have no voice with the CSE or CPSE. That in itself is a procedural violation.

104. Every matter brought up in the due process complaint was related to Management Needs Section of the IEP, the LRE placement and the goals. Generally, inaccurate goals and LRE placement require a procedural violation to be valid. Goals are inaccurate because a procedural violation occurred with regards to collecting present level data or in the setting of unusually low goals for a students present levels so Shen can show that the students achieved the IEP goals as a means to prove the efficacy of a program. LRE placements are inaccurate because procedural violations occurred with regard to filling out forms and also with regard to matching the present LRE of the student.

## SPECIFIC RELIEF SOUGHT

105. Assume jurisdiction over this complaint

106. Given equitable considerations and the appropriateness of the program Parents are providing to A.S., approve pendency for R.S. and E.S. to deliver an ABA a home based therapy and educational program to A.S. at a rate of $32.50[15] per hour approved for 50 hours per week at the expense of the school district until the new program for A.S. is in place.[16]

107. If the ABA therapy and educational program delivered to A.S. by R.S. and E.S. is unilateral placement then given equitable considerations retroactively reimburse R.S. and E.S. at a rate of $32.50 per hour, for delivering an intensive ABA a therapy and educational program to A.S., for 50 hours per week at expense of the school district for the failure to provide a FAPE in the LRE or the New York State Education Department [NYSED] since the IHO failed to issue a pendency decision.

108. With equitable considerations of Tuition Reimbursement for effort of parents to provide a program to A.S. with No pendency decision rendered by the IHO, order the school district or NYSED to retroactively reimburse R.S. and E.S. immediately [within 72 hours of decision] for delivered home based ABA therapy and educational intervention to A.S. at a rate of $32.50 per hour based on a 50-hour week [less scheduled breaks] totaling 950 hours for the period 8/29/2016 to 2/4/2017 totaling $30,875. See [Parents New Exhibit IIII pp. 17 - 22].

---

[15] Rate is calculated from [Parent New Ex. TTT] Bucks County Department of Mental Health/Mental Retardation v. Pennsylvania, 379 F.3d 61 [3d Cir. 2004] Judge awarded uncertified parent $22/hour to deliver ABA to their child at home in 1999. Inflation adjusted to $32.50 per hour for 2016.

[16] The intensity is justified based on A.S.'s positive response to 50-hours, in addition to exhibits offered for evidence but not accepted by the IHO have suggested for example [Parent New Ex. B pp. 5] "The parents worked as part of the treatment team throughout the intervention; they were extensively trained in the treatment procedures so that treatment could take place for almost all of the subjects' waking hours, 365 days a year."

109. Given equitable considerations, order that the district continue to provide recompense of tuition reimbursement to R.S. and E.S. at $32.50 per hour for delivering a home based ABA program to A.S. with Extended School Year [ESY] [summing 1600 hours of targeted intervention[17] for one total year based on a 46 week year] until the ordered program is successfully in place for the extended school year where only typically developing peers [in the case of typically developing peers it would be acceptable to provide intervention at an agreed upon camp like setting [e.g. where typically developing peers can be part of A.S. intervention] .

110. The parents seek that the court overturn the order by the SRO for the CSE to convene within 30 days of the SRO decision dated 4/3/2017 and received in the mail on 4/6/2017.

111. Order that the exhibits proffered by the parents be admitted into evidence. Order that the record is to be reopened at the United States District Court with regard to the management needs and programming section of the IEP.

112. The parents further seek that the court issue an order that the Shenendehowa School District offer A.S. a placement in an all-day general education classroom where there are no other identified students for the entire school day. Further, the parents request that the court order the school to provide a supplementary aid [that is under the employ of a BCBA or a BCBA themselves] to work with A.S. to apply ABA principles, where that aid would serve as an invisible shadow to the extent that the aid works with other students in the classroom 50% of the time to help create an environment where A.S. feels more confident to express himself. [See Parents new Exhibit T pp. 4 para. 3 – 4 for a model of

---

[17] The original calculation was 2300 hours of targeted intervention. However, A.S. attending Saratoga Academy for a period of approximately 3 and one half months this school year reduces the total to 1600 hours

how intervention can be provide within the classroom and in pull out therapy sessions that would involve only other typically developing peers] Here the authors used an intensive ABA program at 35 – 40 hours per week.

113. Similarly, the parents request that the court orders the Shenendehowa School District to provide A.S. with a program that is 40 hours per week in duration [Where discrete trails would make up 20 hours of the 40 hours per week of intervention] Order the following DTT and ABA group therapy be on A.S.'s IEP: small group [2 - 4 students on an increasing gradient with time/progress] soccer group therapy [3 typical peers and A.S.] as a competitive sport/competitive engagement be made part of the IEP at 2x one-hour periods per week and group [no other identified peers] therapy designed to increase A.S. conversational abilities [2 - 4 students on an increasing gradient with time/progress] be implemented [up to 4 typical peers and A.S., with no atypical peers present] at 4x one-hour per week [see Parents new Exhibit T pp. 4 para. 3 – 4], part of this would have 50% pull-out and 50% push-in sessions.  Order that remaining 14 hours discrete trial periods focus on one-on-one conversational skills in a one-on-one setting, writing, vocabulary and reading and also math.

114. Order that Shenendehowa arrange for a consult from Education Models create a classroom and opportunity to improve communication skills for A.S. in an all day general education classroom using Lovaas methods similar to that used in Amerine-Dickins et. Al. [see Parents new Exhibit T pp. 4 para. 3 – 4].   Equitable considerations are relevant in the fashioning relief and to prove to the court that such an order is fair and equitable the parents point out that an ABA program can be provided at Shenendehowa School District in lieu of the Connections Program.

115. Order that the denial of IEP goals too similar to the standard kindergarten curriculum was a procedural violation that impeded A.S. right to a FAPE, significantly impeded the parents' opportunity to participate in the IEP decision making process, would cause a deprivation of educational benefits and was a violation of Section 504 of the Rehabilitation Act of 1973.

116. Order changes in the IEP Management Needs Section and order that an intensive ABA or an EIBI[18] [Early Intensive Behavioral Intervention Program[19]] be provided to A.S. in a general education classroom at an intensity of 40 hours per week, where the program will occur in one of Shenendehowa's elementary schools.

117. Order that these changes sustain until A.S. has reached an IQ and VABS [or equivalent] both[20] exceeding a standard score of 90 in the IQ and 85 in the VABS. The discrete-trial-room should ensure the privacy of the students receiving the discrete trial from other students unless they are receiving discrete trials concurrently in the same room.[21]

---

[18]EIBI is a term that is equivalent to intensive ABA so long as child is less than 8 years old.

[19]Include the provision of an intensive ABA program will be provided to A.S. with a Board Certified Behavior Analyst [BCBA] provided by Educational Models, or at a minimum agreeable by the parents, to create a program modeled after Newmeadow for the intensive ABA program [25 hours per week] but in a general education setting and then an additional DTT program [25 hours per week, that will include 10 hours of push in and pull out sessions per week]. And that at all times Teachers, aids, therapists and any adults must interact with A.S. in the same way as typical peers, so an not to segregate nor draw attention, nor treat differently A.S. from any other child other than the distribution of time spent with him. Thus, execution must be done so A.S. cannot be distinguished from a typical peer based on the manner the adult interacts with A.S. *see* [Parent New Ex. T pp. 4 par. 4; Tr. pp. 1072 – 1076]

[20] The organization administering any IQ and VABS tests will be selected by the parents at the District's expense.

[21]There shall be no moment in time where A.S. will be in a room or in a sectioned off space or working in a group or sitting at a table, or receiving any intervention or therapy that is not atleast 50% typically developing peers excepting when he is the only child in the room.

118. Order that the Shenendehowa School District and the Fall 2016 Connections Program kindergarten teacher engaged in a misrepresentation akin to egregious misstatement to R.S. and E.S.

119. Order that all exhibits provided by petitioners be accepted into evidence and be admissible.

120. Order formal measures of IEP success for A.S. by 3 means all at District Expense: 1. The attainment of goals in the standard curriculum or first grade curriculum as based on A.S. newly established present levels of performance. 2. A.S.'s VABS composite score with maladaptive behavior option 3. A.S.'s IQ test with a performance IQ and verbal IQ breakout.[22]

121. Order that parents have access to observe A.S. in class, DTT and in group therapy working with other students upon request.

122. Order that the parents be reimbursed for legal efforts and expenses as a prevailing party for $29,500 [up to 5/2/2017] based on 560 hours at $50 per hour of effort and expenses.

123. Further Order that the district failed to apply a Newington/Cornwall Analysis for the IEP in 2014 – 2015 and consequently A.S. was placed in a self contained program at Newmeadow for 6 months, which caused irreparable damages because of the developmental gains A.S. lost out on had he been initially placed in an integrated environment.

124. Order to that Methodology is now permissible to be written in a student's IEP in the Northern District of New York.

---

[22]The person administering the VABS and IQ test must have a crystal clear voice that is to be 1 SD above average [as determined by a technically sound instrument and independent evaluation] in articulation and expressive language. An independent organization agreed to by the parent will execute the evaluations

125. Order that a comprehensive intensive ABA methodology in a student's LRE is now a matter of right for children in this N.D.N.Y. and the State of New York with ASD [based on the criteria of ASD classification on this date 5/9/2017] to have on their IEP.

126. Find that filing an Individual Home Instruction Plan [IHIP] is not necessary if there is a dispute and legal proceeding in the IEP and the parents see fit to provide intervention themselves to their child so long as they provide educational updates and establish that their child can successfully achieve goals that are more advanced than those set by the school district.

Respectfully Submitted

May 9, 2017

R        S\

El        S